# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**TINA ROBINSON**,

    Plaintiff,

v.                                                                Case No. 8:24-cv-00828-WFJ-AAS

**3M COMPANY**,
and **ARIZANT HEALTHCARE, INC.**,

    Defendants.

_____/

## ORDER

Before the Court are Defendants 3M Company and Arizant Healthcare, Inc.'s (collectively "3M" or "Defendants") Motion to Exclude Plaintiff's General Causation Experts, Motion to Exclude Specific Causation Opinions of Plaintiff's Expert Dr. Yoav Golan, and Motion for Summary Judgment. Dkts. 73, 74, & 76. Plaintiff Tina Robinson has responded to all three motions, Dkts. 79, 80, & 81, and Defendant 3M replied. Dkts. 88, 85, & 87. Upon careful consideration, the Court denies Defendants' Motion to Exclude Plaintiff's General Causation Experts, denies Defendants' Motion to Exclude Specific Causation Opinions of Plaintiff's Expert Dr. Yoav Golan, and denies in part and grants in part Defendants' Motion for Summary Judgment.

## BACKGROUND

This case was transferred to this Court from the District of Minnesota as part of the larger MDL proceeding *In re: Bair Hugger Forced Air Warming Devices Products Liability Litigation*, MDL 15-2666-JNE (D. Minn. Apr. 19, 2016). Plaintiff's case was transferred to the Middle District of Florida and assigned to the undersigned on April 1, 2024. Dkt. 10 at 8.

On April 23, 2021, Plaintiff Robinson presented to the emergency department at HCA Florida Brandon Hospital ("Brandon Hospital") in Brandon, Florida, after a dog ran into the lateral aspect of her right knee, knocking her down. Dkt. 75 ¶ 23. A subsequent radiology scan revealed an unstable fracture to her right tibia, and surgery was recommended. *Id.* ¶ 24. Two weeks later, on May 6, 2021, Robinson underwent an open reduction and internal fixation ("ORIF") procedure to repair her tibial plateau split depressed fracture,[1] performed by Dr. Anjan Shah at Brandon Hospital. *Id.* ¶ 25. During the ORIF surgery, the surgeon and anesthesiologist used the Bair Hugger Force Air Warming System (the "Bair Hugger"). *Id.* ¶ 26. The Bair Hugger is a forced-air warming device used during surgical procedures to prevent a patient's core body temperature from dropping, thereby mitigating the risk of hypothermia. *Id.* ¶¶ 4–5, 9. The product works by

---

[1] A tibial plateau fracture is an injury where the patient breaks the bone and damages the cartilage on top of the tibia (the bottom part of their knee).

warming ambient air in the heating unit, and then a blower pushes the air through a hose into a perforated blanket placed over the patient's chest and arms. *Id.* ¶¶ 4–5.

Plaintiff claims that the Bair Hugger injured her by introducing contaminants into her open surgical wound, leading to a *Staphylococcus aureus* ("*S. aureus*") infection that required intervention, management, and two additional surgeries. *Id.* ¶ 26; Dkt. 53 ¶¶ 90–95. Ms. Robinson was not involved in the decision to use the Bair Hugger system during her surgery and was not aware that the product had been used until months later. Dkt. 75 ¶ 27. The initial decision to use the Bair Hugger system in Ms. Robinson's surgery was the responsibility of her anesthesiologist, Dr. Calvin Kim. *Id.* ¶ 28. However, Dr. Shah, as the surgeon, was the ultimate decision-maker with the authority to overrule the decisions of other operating room ("OR") staff. Dkt. 83 ¶ 35. Dr. Kim has worked with Dr. Shah in prior surgeries and was never ordered to stop using the Bair Hugger in Plaintiff's ORIF surgery. Dkt. 75 ¶ 33. Nor has Dr. Kim ever experienced a scenario in which Dr. Shah was involved in the anesthesiologist's decision regarding the use of a warming device. *Id.* ¶ 34.

Plaintiff filed suit in the Bair Hugger MDL on August 7, 2023. *Id.* ¶ 40. On August 1, 2024, Robinson filed an Amended Complaint alleging eight claims against Defendant 3M: (1) negligence; (2) gross negligence; (3) failure-to-warn under Fla. Stat. § 768.81; (4) design defect under Fla. Stat. § 768.81; (5) breach of

implied warranty of merchantability under Fla. Stat. § 672.314; (6) violation of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"); (7) misleading advertising under Fla. Stat. § 817.41; and (8) unjust enrichment. Dkt. 53 ¶¶ 96–178. Plaintiff seeks compensatory and punitive damages pursuant to these claims. *Id.* ¶¶ 179–195. On March 18, 2025, Defendants filed their motions to exclude testimony from Plaintiff's general and specific causation experts (Dkts. 73 & 74) and a motion for summary judgment (Dkt. 76). The Court will address each one in turn.

## I.     Motion(s) to Exclude under Rule 702

Defendants have moved to exclude the testimony and opinions of Plaintiff's one general causation medical expert (Dr. Yoav Golan), one general causation engineering expert (Dr. Said Elghobashi), and one specific causation expert (Dr. Golan, again) under Federal Rule of Evidence 702. The opinions of the general causation experts are offered to establish that the Bair Hugger can cause a non-joint infection in ORIF surgical patients. The specific causation opinion is offered to establish that the Bair Hugger did, in fact, cause Plaintiff's non-joint infection following ORIF surgery in 2021. *See Chapman v. Procter & Gamble Distrib.*, LLC, 766 F.3d 1296, 1316 (11th Cir. 2014).

*a. Legal Standard*

A qualified witness may offer an expert opinion if it is more likely than not

that "(a) the expert's scientific, technical, or other specialized knowledge will help

the trier of fact to understand the evidence or to determine a fact in issue; (b) the

testimony is based on sufficient facts or data; (c) the testimony is the product of

reliable principles and methods; and (d) the expert's opinion reflects a reliable

application of the principles and methods to the facts of the case." Fed. R. Evid.

702; *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). "The

party offering the expert testimony bears the burden of establishing, by a

preponderance of the evidence, the expert's qualification, reliability, and

helpfulness." *Payne v. C.R. Bard, Inc.*, 606 F. App'x 940, 942 (11th Cir.

2015) (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en

banc)). When determining the qualifications, reliability, and helpfulness/relevance

of an expert's testimony, "the judge performs a 'gatekeeping' function." *Chapman*,

766 F.3d at 1304 (quoting *Daubert*, 509 U.S. at 589 n.7).

The first requirement for the admissibility of expert testimony is

qualification. "A witness is qualified as an expert if he is the type of person who

should be testifying on the matter at hand." *Moore v. Intuitive Surgical, Inc.*, 995

F.3d 839, 852 (11th Cir. 2021) (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK

Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). For example, "scientific training or

education may provide possible means to qualify, [and] experience in a field may offer another path to expert status." *Frazier*, 387 F.3d at 1260–61. Importantly, the Eleventh Circuit has warned that "the qualifications and reliability prongs of *Daubert* are conceptually distinct inquiries that district courts may not collapse into each other." *Moore*, 995 F.3d at 853. In product liability cases, there is no requirement "that an expert witness is qualified to testify regarding the cause of an injury only if he personally has used the allegedly defective product." *Id.* at 854. Such a bright-line rule would set the qualified bar "too high" and "would bar all expert medical testimony unless the expert has somehow recreated the same conditions that the patient was under." *Id.* (alterations accepted) (citing *Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1335 (11th Cir. 2014)).

Next, "[a]n expert opinion is reliable if it was arrived at through, among other things, a scientifically valid methodology." *Id.* at 852 (citation omitted). The Eleventh Circuit has identified four factors to guide district judges in assessing the reliability prong of an expert's methodology:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community.

*Chapman*, 766 F.3d at 1305 (quoting *United Fire & Cas. Co. v. Whirlpool Corp.,* 704 F.3d 1338, 1341 (11th Cir. 2013) (per curiam)). While this inquiry is "a

flexible one," the focus "must be solely on principles and methodology, not on the
conclusions that they generate." *Daubert*, 509 U.S. at 594–95. "'But conclusions
and methodology are not entirely distinct from one another'; neither *Daubert* nor
Federal Rule of Evidence 702 requires a trial judge 'to admit opinion evidence that
is connected to existing data only by the *ipse dixit* of the expert.'" *Chapman*, 766
F.3d at 1305 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141–43 (1997)).
"Instead, the judge is free to conclude that there is simply too great an analytical
gap between the data and the opinion proffered." *Id.* at 1305 (citing *Hendrix ex rel.
G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (internal quotations
omitted)).

Third, under the relevance prong, expert testimony must be "relevant to the
task at hand" by "logically advance[ing] a material aspect" of the case. *Daubert* at
591. In other words, the "relationship must be an appropriate 'fit' with respect to
the offered opinion and the facts of the case." *McDowell v. Brown*, 392 F.3d 1283,
1299 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 591). "[T]here is no fit where a
large analytical leap must be made between the facts and the opinion." *Id.* (citing
*Gen. Elec. Co.*, 522 U.S. at 146). Again, the trial court "may conclude that there is
simply too great an analytical gap between the data and the opinion proffered." 
*Gen. Elec. Co.*, 522 U.S. at 146.

Finally, the district court's gatekeeper role is not supposed to "supplant the adversary system or the role of the jury." *McDowell*, 392 F.3d at 1299 (citing *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999)). Instead, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (internal quotations omitted).

### b. Analysis

Defendants challenge the admissibility of testimony by Plaintiff's general and specific causation experts. Dkts. 73 & 74. A plaintiff seeking to establish the causation element of a products liability claim must present admissible expert testimony supporting both general causation and specific causation. *Chapman*, 766 F.3d at 1316 (stating that, to prove a product caused the plaintiff's injury, the plaintiff was "*required* to have *Daubert*-qualified, general and specific-causation-expert testimony that would be admissible at trial to avoid summary judgment" (emphasis in original)); *see Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1334 n.4 (11th Cir. 2010); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005).

General causation refers to whether the product can cause the injury in question. *Kilpatrick*, 613 F.3d at 1334 n.4. Specific causation refers to whether the product did in fact cause the plaintiff's injury. *Id.* General causation is proven with

expert testimony that first "rules in" possible causes of the plaintiff's injury. *Hendrix*, 609 F.3d at 1195 ("[T]he district court must ensure that, for each possible cause the expert 'rules in' at the first stage of the analysis, the expert's opinion on general causation is derived from scientifically valid methodology." (citation omitted)). Then, a specific causation expert must "rule out" other potential causes based on additional evidence, tests, or analysis, leading to a conclusion that the remaining possible cause is (more likely than not) the actual cause. *See Chapman*, 766 F.3d at 1309–10; *Kilpatrick*, 613 F.3d at 1342–43. Specific causation can be established by experts using a methodology known as differential etiology (sometimes referred to as "differential diagnosis"). *See Chapman*, 766 F.3d at 1308–09.

### i.  Motion to Exclude Plaintiff's General Causation Experts

"General causation refers to the 'general issue of whether a substance has the potential to cause the plaintiff's injury.'" *Chapman*, 766 F.3d at 1306 (quoting *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1248 n.1 (11th Cir. 2010)). As discussed above, this analysis can be done with expert testimony that first "rules in" possible causes. *Thelen v. Somatics, LLC*, No. 8:20-CV-1724-TPB-JSS, 2023 WL 3947945, at *3 (M.D. Fla. June 12, 2023).

In Defendants' motion to exclude Plaintiff's general causation experts, 3M argues that Plaintiff has failed to meet the relevance prong of Rule 702.

Specifically, unlike the majority of cases in the Bair Hugger MDL, this case does
not involve a periprosthetic joint infection ("PJI") following a knee or hip
prosthetic joint arthroplasty ("PJA"). Dkt. 73 at 1. As such, Plaintiff's expert
opinions that the Bair Hugger system causes infections in tibia repair surgeries or
an ORIF procedure are not appropriate since much of the scientific evidence (from
the Bair Hugger MDL) does not "fit" this case. *Id.* Plaintiff has two expert
witnesses who will offer general causation testimony: Dr. Said Elghobashi and Dr.
Yoav Golan. *See* Dkt. 79 at 1, 3.

### 1. Dr. Said Elghobashi

Dr. Said Elghobashi is an engineering expert in the field of computational
fluid dynamics ("CFD"). Dkt. 73 at 2. As part of the larger Bair Hugger MDL, Dr.
Elghobashi developed a CFD simulation that used a three-dimensional design to
replicate an OR and analyze how forced-air warming devices impact the
performance of ultra-clean ventilation systems. *See* Dkt. 79-1 at 2, 7–11.[2] The
results of this simulation showed that with the Bair Hugger's blower on, "a large
number of squames [human skin cells large enough to carry bacteria] are lifted
upwards by the rising thermal plumes . . . [which] are lifted above the surgeons['] 
heads and are blown towards the [operating theater] by the downward moving
ventilation air. . . . Statistically significant particles do enter the imaginary boxes of

---

[2] Dr. Elghobashi eventually published his expert report with several coauthors in a peer-reviewed journal. *See* X. He et al., *Effect of Heated-Air Blanket on the Dispersion of Squames in an Operating Room*, 34 Int'l J. Numerical Methods Biomedical Eng'g, May 2018 at 1.

interest above the operating table and the patient's knee. Few particles are also observed above the side tables [where surgical tools are located]." *Id.* at 61–62.[3]

Here, Defendants do not challenge Dr. Elghobashi's qualifications or the reliability of his opinions under Rule 702.[4] Instead, Defendants seek to preclude Dr. Elghobashi's expert report on the relevance prong, arguing that his testimony does not "fit" the facts of this case since his model does not show "how the Bair Hugger system would impact airflow in the context of Robinson's specific type of surgery (ORIF)." Dkt. 73 at 2. Plaintiff responds by noting that while Dr. Elghobashi's study was modeled after a knee surgery, the study still "specifically looked at four different areas within the OR[:] areas over two side tables, the entire operating theater (including the patient's entire body), and the surgical area in particular (which happened to be the patients knee area in the model). The study found that the [Bair Hugger] blew squames into all four areas." Dkt. 79 at 8–9.

Here, the Court agrees with Plaintiff and rejects Defendants' relevance challenge to Dr. Elghobashi's report. Defendants' effort to differentiate the CFD

---

[3] More specifically, approximately three million 10-µm-sized squames were placed on the floor of the model OR around the operating table (on average, a person sheds about ten million squames a day). Dkt. 79-1 at 42, 60–61. Based on mathematical equations, Dr. Elghobashi simulated whether the Bair Hugger's thermal plumes could blow these 10-µm-sized squames—large enough to carry bacteria—into four "regions of interest" in the OR, including the surgical site itself. *Id.* at 55–59.

[4] To the extent that Defendants are challenging the reliability of Dr. Elghobashi's report, such arguments have already been rejected *In Re: Bair Hugger Forced Air Warming Products Liability Litigation*, 9 F.4th 768, 783 n.6 (8th Cir. 2021). While not binding on this Court, the Eighth Circuit's ruling on the limited admissibility of Dr. Elghobashi's testimony, as it relates to reliability, is persuasive and has been proven by a preponderance of the evidence. *See id.* at 782–83 ("Dr. Elghobashi set out to determine whether forced-air warming 'play[s] a role in transporting squame particles to the surgical site'; his CFD model tested this hypothesis; and he found that forced-air warming does play a role, at least in certain OR conditions with limited airflow disruptions from other sources. So limited, his conclusion was tested and supported by the CFD model, and the problematic analytical gap found by the MDL court is gone.").

model used in Dr. Elghobashi's study from an ORIF surgery is a distinction
without a difference, since Dr. Elghobashi's simulation clearly examined the
distribution of squames over a significantly larger area than just the knee. The CFD
simulated the distribution of squames over four different areas: two side tables, the
area above the operating theater, and the area above the patient's knee. *See* Dkt.
79-1 at 56 (showing a figure of the four zones). The study concluded that
"[s]tatistically significant particles do enter the imaginary boxes of interest above
the *operating table* and the patient's knee." *Id.* at 62 (emphasis added); *see also id.*
("Large number of squames are seen to be above the [operating theater], several
are surrounding the surgeons['] hands, above the side tables, and some are very
close to the patient's knee and the surgical site."). The Court finds Dr.
Elghobashi's expert report sufficiently "rules in" the Bair Hugger as a possible
cause for how squames could be transported to the surgical site in ORIF surgery
for a tibial plateau fracture (only located a couple of inches from the knee). This is
not so large an analytical leap—or in this case, not so large a physical gap between
a knee PJA and ORIF surgery for a tibial plateau fracture—that would exclude Dr.
Elghobashi's expert report under Rule 702. *See McDowell,* 392 F.3d at
1299 (noting "there is no fit where a large analytical leap must be made between
the facts and the opinion," such as proffering animal studies concerning a type
of cancer in mice to establish a different cancer in humans (citing *Gen. Elec.*

*Co.*, 522 U.S. at 146)); *see also Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) ("[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." (citation omitted)).

## 2. Dr. Yoav Golan

While Dr. Elghobashi's expert testimony is reliable, Plaintiff must still bridge the analytical gap between the airflow disruption theory[5] and a surgical site infection following ORIF surgery. Put differently, Plaintiff's general causation expert needs to "rule in" bacteria-carrying squames as a potential cause of infection in an ORIF surgery. To bridge this gap, Plaintiff points to testimony from Dr. Yoav Golan, an infectious disease expert, who opined that bacteria landing on the hardware inserted into the tibia during an ORIF procedure can cause a *S. aureus* infection. *See* Dkt. 79 at 11; Dkt. 73-4 at 6 (showing Dr. Golan's expert report). To support this opinion, Dr. Golan adopted the report of another expert witness in the larger MDL case and referenced several studies. Dkt. 73-4 at 2, 7 (listing references and noting Dr. Golan has "reviewed the report authored by Dr.

---

[5] In the Bair Hugger MDL, there are two general causation theories by which the Bair Hugger could introduce bacteria into a surgical site to cause infection. Under the "dirty-machine theory," the Bair Hugger is the source of the infection-causing bacteria, and the hose blows the bacteria out of the perforated blanket onto the surgical site. Dkt. 73 at 3. Under the "airflow-disruption theory," the Bair Hugger system disrupts OR airflow by blowing squames (on the floor) up and over the operating table into the surgical site. *Id.* Here, Dr. Golan's general causation opinion is based on the air-flow disruption theory since he opines that the Bair Hugger system "was the likely cause" of Robinson's *S. aureus* infection because it "generates an uplifting of air carrying particles that are contaminated with microbes . . . capable of causing hardware infection[,]" and "[i]t is likely that a sufficient number of these contaminated particles landed in the surgical field and contaminated it." Dkt. 73-4 at 6. However, as discussed in further detail below, Dr. Golan cites studies that relate more to the dirty-machine theory. Regardless, the Court finds Dr. Golan's general causation opinion admissible under Rule 702.

William Jarvis from 2017 . . . [and] agree[s] with the conclusions [Dr. Jarvis] reached concerning evidence that the Bair Hugger is capable of causing periprosthetic joint infections. I adopt his report and supplement it with reference to additional studies published since 2017").

Defendants, however, argue that "nothing in Dr. Golan's report or deposition testimony provides a valid scientific basis to extrapolate PJA/PJI-related general causation opinions to the facts here." Dkt. 73 at 8. Specifically, Dr. Golan's general causation testimony is not reliable since "he failed to identify a valid scientific basis to extrapolate his PJA/PJI-related general causation opinions," and "he cannot alone analogize between the Bair Hugger system's impact on airflow in a PJA relative to an ORIF procedure." *Id.* at 8–9.

The Eleventh Circuit has "identified some of the scientifically valid methods for establishing general causation," including expert opinions based on "epidemiological studies, provided the expert explains how the findings of those studies may be reliably connected to the facts of the particular case." *Hendrix*, 609 F.3d at 1196–97 (citation omitted); *see also Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1198 (11th Cir. 2002) ("It is well-settled that while epidemiological studies may be powerful evidence of causation, the lack thereof is not fatal to a plaintiff's case.").

14

Here, Dr. Golan's general causation testimony is sufficiently reliable under *Daubert* to warrant admission at trial. As discussed above, epidemiological studies are strong evidence of causation, and Dr. Golan's opinion is based on at least two such studies. First, Dr. Golan references P.D. McGovern et al., *Forced-Air Warming and Ultra-Clean Ventilation Do Not Mix*, 93-B J. Bone & Joint Surgery 1537 (2011) ("McGovern 2011").[6] *See* Dkt. 73-4 at 7 (referencing McGovern 2011); Dkt. 73-5 (showing the McGovern 2011 study); Dkt. 79-3 at 175:15-176:19 (Dr. Golan testifying that he relied on many different studies, including McGovern 2011). Following other federal courts, the Court finds that McGovern 2011 is a sufficiently reliable study for Dr. Golan to base his general causation opinion on. *See e.g.*, *Boncher v. 3M Co.*, No. 5:24-CV-01403-JMG, 2025 WL 511116, at *7 (E.D. Pa. Feb. 14, 2025) (finding the "limitations and potential shortcomings in [McGovern 2011] do not make the study *per se* unreliable, as the strength of the study goes to its weight, not admissibility"). Indeed, as the Eighth Circuit *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th 768 (8th Cir. 2021) already concluded, "it was not necessarily unreliable for the

---

[6] McGovern 2011 was an observational epidemiological study that explored whether forced-air warming was associated with an increased rate of PJIs by comparing a group of individuals warmed convectively to a group of individuals warmed conductively. *See* Dkt. 73-5 at 1537. The study reviewed infection data from hip or knee replacement surgeries performed at a single hospital for a 2.5-year period. *Id.* at 1537, 1540. During this period, patients were warmed with Bair Huggers and then slowly transitioned to being warmed with conductive patient-warming devices. *Id.* at 1540, 1543. The researchers found an association between the use of the Bair Hugger in ORs and surgical site infections, but the study "[did] not establish a causal basis" for this increased risk. *Id.* at 1543. The researchers also acknowledged other limitations, including the "infection control measures instituted by the hospital" and being unable to fully examine patients' medical histories for factors associated with PJIs. *Id.*

experts to rely on McGovern 2011 to draw an inference of causation just because the study itself recognized . . . that the association did not establish causation. So long as an expert does the work 'to bridge the gap between association and causation,' a study disclaiming having proven causation may nevertheless support such a conclusion." 9 F.4th at 779–80 (quoting Federal Judicial Center, *Reference Manual on Scientific Evidence* at 218 (3d ed. 2011)).

Second, Dr. Golan references S.H. Kim et al., R*elationship Between Types of Warming Devices and Surgical Site Infection in Patients Who Underwent Posterior Fusion Surgery Based on National Data*, 20 Neurospine 1328 (2023) ("Kim 2023"). *See* Dkt. 73-4 at 7 (referencing Kim 2023); Dkt. 104-26 (showing the Kim 2023 study). In Kim 2023, researchers in South Korea examined 5,406 patients in the Health Insurance and Review Assessment Service database who underwent posterior lumbar fusion surgery during 2014, 2015, and 2017. Dkt. 104-26 at 1328. The goal of the nationwide study was to examine the effects of warming devices on surgical site infection rates during posterior fusion surgery. *Id.* Kim 2023 found that "[c]ompared with those not treated with intraoperative warming devices, those treated with forced air warming devices were 1.73-fold more likely . . . to develop [surgical site infection] after adjusting for all covariates." *Id.* at 1331. Further, "an analysis of patients administered antibiotics 21 to 60 minutes before surgery showed that the risk of [surgical site infection]

was 5.17-fold . . . higher in patients treated with forced air than with no intraoperative warming device." *Id.* As such, the researchers concluded that "the results of the present study showing that use of forced warming devices increases [surgical site infection] rates are clinically meaningful[,]" and "devices using [electric] conduction seemed to have more advantages in preventing [surgical site infection] than forced air warming device[s]." *Id.* at 1334.

Critically, Defendants do not attack the reliability of Kim 2023; instead, Defendants contend the study does not "fit" since the study did not examine ORIF procedures and there is no evidence that the Bair Hugger was the warming device used in South Korean hospitals. Dkt. 105 at 6. While Defendants are correct about the limitations of Kim 2023 (examining posterior lumbar fusion surgery) to an ORIF procedure,[7] the argument does not undermine the reliability of Dr. Golan's overall general causation opinion, since Kim 2023 is one of several studies Dr. Golan referenced in formulating his opinion that forced air warmers (like the Bair Hugger) can be a potential source of surgical site infection. Indeed, the Court finds Dr. Golan's reliance on other medical studies beyond McGovern 2011 and Kim 2023 supports his general causation opinion that the uplifting of bacteria by the Bair Hugger is generally capable of causing a hardware infection during an ORIF

---

[7] Interestingly, Defendants' "different surgery" argument also cuts the other way in Plaintiff's favor. Kim 2023 provides empirical support that forced-air warmers may increase surgical site infection rates in a surgical procedure different from a PJA. As such, Dr. Golan opining that the Bair Hugger can be "ruled in" as a possible infection source in a different surgery from a PJA (i.e., an ORIF procedure) is not so large of an analytical jump as Defendants claim.

procedure. As Dr. Golan made clear in his deposition, his causation opinions were not based solely on McGovern 2011, but "on [a] multitude of references and studies and not one particular study. . . . So my opinion is, based on all of those studies together, and none of those studies by itself, is the sole support to my opinion." Dkt. 79-3 at 176:1-19.

These additional (non-epidemiological) studies include A.J. Legg, et. al., *Do Forced Air Patient-Warming Devices Disrupt Unidirectional Downward Airflow?*, 94-B J. Bone & Joint Surgery 254 (2012), where the authors found a statistically significant increase in particles measuring 5.0 μm in size over the surgical site when forced-air warming was used (Dkt. 104-2 at 255–56); K.B. Dasari, et. al., *Effect of Forced-Air Warming on the Performance of Operating Theatre Laminar Flow Ventilation*, 67 Anaesthesia 244 (2012), where the researchers investigated whether the floor-to-ceiling temperatures around a draped manikin in a laminar-flow theatre differed when using three types of warming devices, including the Bair Hugger, and found that forced-air warming "generates convection current activity in the vicinity of the surgical site. . . . [and] these currents may disrupt ventilation airflows intended to clear airborne contaminants from the surgical site" (Dkt. 104-20 at 244, 248); A.M. Wood, et al., *Infection Control Hazards Associated with the Use of Forced-Air Warming in Operating Theatres*, 88 J. Hosp. Infection 132 (2014), where the authors concluded, after a

review of the literature, that forced-air warming "does contaminate ultra-clean air ventilation," though acknowledging that "current research" had not shown a "definite link" between forced-air warming and surgical-site infections (Dkt. 83-21 at 132); V. Lange, *Forced Air Contamination Risk in the OR*, 73 Annals of Medicine and Surgery 1 (2022), where the author conducted a retrospective-research correlation on a previous 2018 study on forced air-warming contamination and found that "[forced air warming] device-component contamination is a real risk in the OR. . . . Based on the correlation between pathogen and [surgical site infection] risk, it has been determined that infection risk may be eliminated through the use of alternate patient-warming technologies/techniques" (Dkt. 104-15 at 3); J.G. Brock-Utne, et al., *Potential Sources of Operating Room Air Contamination: A Preliminary Study*, 113 J. of Hosp. Infection 59 (2021), where the researchers specifically looked at two forced air-warmers (Neptune Surgical Suction system and the Bair Hugger), observed higher bacterial counts in the Bair Hugger outlet hose that blows air than in the surrounding OR air, and concluded that "the [Bair Hugger] is likely a direct contributor to an increased burden of airborne microbes in the OR" (Dkt. 104-16 at 61, 63); and Mark Albrecht, et al., *Forced-Air Warming Blowers: An Evaluation of Filtration Adequacy and Airborne Contamination Emissions in the Operating Room*, 39 Am. J. Infection Control 321 (2011), where the authors compared five

19

new Bair Hugger intake filters to 52 Bair Hugger filters currently in use at hospitals and found "[f]ifty-eight percent of the [forced air-warming] blowers evaluated were internally generating and emitting airborne contaminants, with microorganisms detected on the internal air path surfaces of 92.3% of these blowers[,]" including *S. aureus* (Dkt. 104-4 at 321).

Importantly, Defendants do not challenge the reliability of these studies, some of which have been cited by *Amando* and another district court (involved in Bair Hugger litigation) to support general causation under an airflow-disruption and dirty-machine theory. *See Amando*, 9 F.4th at 781–87; *Boncher*, 2025 WL 511116, at *7–8. Instead, Defendants contend "Dr. Golan offers no scientific support for what amounts to a series of analytical leaps" between the various studies and an ORIF procedure. Dkt. 73 at 9. But, as the Court's sampling of the references show, Dr. Golan's plausible mechanism (i.e., airflow-disruption theory from Dr. Elghobashi) in explaining the association between the use of the Bair Hugger in an OR and increased particle counts over the surgical site of an ORIF surgery (which can be a source of infection) is based on reliable methodology that draws causal inferences from associations identified in peer-reviewed scientific literature and case studies.

As for the differences between ORIF and PJA surgery, Dr. Golan testified he was confident the literature he relied on showed "that the Bair Hugger in Ms.

Robinson's OR in May of 2021 was capable of doing the same thing that it does in

other cases involving a total joint arthroplasty[.]" Dkt. 79-3 at 153:17-23.

Specifically, Dr. Golan articulated that:

> the operation of the Bair Hugger leads to contamination of the
> operating room with particles, so that there is a much, much larger
> number of particles in the operating room air. It interferes with the
> different measures that we use in the operating room to reduce the
> number of loading particles.
>
> And we know that many of those particles are contaminated, and it
> leads to landing of contaminated particles in the sterile field, whatever
> the sterile field is -- whether it's an exposed tibia or whether it's
> exposed end of the tibia -- you have to understand knee replacement
> surgery. It's the tibia that's exposed.
>
> The only other thing that's exposed is the femur, and here the tibia is
> exposed. And in addition to that, there's hardware that's exposed. And
> it doesn't matter at all whether the hardware has this shape or that
> shape.
>
> So from my perspective, all the information that I saw that relates to
> the Bair Hugger contaminating the operating room was just as
> applicable to tibia fractures as it is to prosthetic joint infection
> surgery.

*Id.* at 154:2-155:2. As such, Dr. Golan concluded that the "infection risk" and

"what affects the infection risk" in both types of surgeries are "very similar." *Id.* at

247:9-248:15.

Defendants, of course, strongly dispute Dr. Golan's finding that the type of

hardware is not a significant factor in considering the infection risk. *See* Dkt. 105

at 2–4. Indeed, Defendants persuasively argue that the hardware in a PJA/total

joint arthroplasty—two large metal implants: a polyethylene spacer and a patella implant—provides a large, non-vascularized surface for bacteria to adhere to when it lands on the exposed surgical site. *Id.* at 3. Conversely, the hardware in Ms. Robinson's ORIF surgery consists of thinner plates and screws that are buried into vascularized bone and surrounded by vascularized tissue, resulting in a less exposed surface area that impacts the ability of bacteria to attach. *Id.* at 4. Nevertheless, the Court admits Dr. Golan's sufficiently reliable testimony since the "traditional and appropriate means of attacking shaky but admissible evidence" is for Defendants to present to the jury "contrary evidence" on the different infection risks in PJA and ORIF procedure. *Allison*, 184 F.3d at 1311 (citing *Daubert*, 509 U.S. at 596).[8]

At bottom, this is not a case where the gap between the scientific studies and the general causation opinion is "simply too great." *Hendrix*, 609 F.3d 1203 (noting the expert "did not even attempt to provide any evidence to support a general causal link between traumatic brain injury and [Autism Spectrum

---

[8] Defendants also fault Dr. Golan for simply "agree[ing]" and "adopt[ing]" the conclusion of Dr. Jarvis concerning the Bair Hugger causing periprosthetic joint infections. Dkt. 105 at 12. While Defendant is correct that "[e]xpert opinions ordinarily cannot be based upon the opinion of others[,]" *Am. Key Corp. v. Cole Nat. Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985), Dr. Golan's general causation opinion is not simply a regurgitation of Dr. Jarvis's findings. Dr. Golan assessed the validity of Dr. Jarvis's report by reviewing the cited materials in the Jarvis report and then compiled his own report (based on empirical sources) to opine that airborne microbes caused a surgical site infection following Ms. Robinson's surgery. *See* Dkt. 79-3 at 132:15-133:15 (Dr. Golan testifying he received Dr. Jarvis's report and "reviewed the references used for the Jarvis report, because I wouldn't take the Jarvis report just because it's the Jarvis report"); *Schoen v. State Farm Fire & Cas. Co.*, 638 F. Supp. 3d 1339, 1349 (S.D. Ala. 2022) ("Rule 703 does not permit an expert to simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon." (citing *La Gorce Palace Condo. Ass'n, Inc. v. Blackboard Specialty Ins. Co.*, 586 F. Supp. 3d 1300, 1306 (S.D. Fla. 2022)).

Disorder]. He presented no medical literature, described no relevant physiological process, and provided no other support for his conclusion that traumatic brain injury can cause autism"). Although the Court is to serve as a gatekeeper to ensure the requirements of qualification, reliability, and fit are met, "[t]he judge's role is to [also] see that the jury hears reliable and relevant evidence[.]" *McDowell*, 392 F.3d at 1299. Thus, Defendants' concerns regarding the strength of the studies that Plaintiff's general causation experts relied on or the conclusions they have drawn from them as applied in the ORIF context can be challenged on cross-examination and with the presentation of contrary evidence during their case-in-chief. Plaintiff's general causation opinions are reliable and admissible under Rule 702.

ii.  Motion to Exclude Plaintiff's Specific Causation Expert

Next, Defendants move to exclude the specific causation opinion of Dr. Yoav Golan. Dkt. 74 at 3. First, 3M contends that Dr. Golan's specific causation theory—that the Bair Hugger can cause airflow disruptions that moved contaminated squames into Ms. Robinson's surgical site, causing her infection— should be excluded since Dr. Golan is unqualified to offer an opinion on airflow disruption, his opinions are based on unreliable methods, and there is insufficient facts and data to support his causation theory. *Id.* Second, Dr. Golan's differential diagnosis allegedly "fails to properly 'rule in' the Bair Hugger system (the source

23

he ultimately implicates)" and "rule out" other surgical site infection sources. *Id.*
The Court addresses each argument in turn.

Beginning with Dr. Golan's qualifications, the Court finds Dr. Golan is
qualified to provide expert opinion on infectious diseases. Indeed, with over three
decades of education, training, and experience in the field of infectious diseases,
Dr. Golan is undoubtedly qualified to offer expert testimony on the most likely
cause of Ms. Robinson's infection. *See* Dkt. 80-2 (showing Dr. Golan's CV). As to
Defendants' arguments that Dr. Golan is unqualified to give opinions on how the
Bair Hugger system disrupted the airflow in Ms. Robinson's surgery, *see* Dkt. 74
at 8, the Court finds such an argument is without merit. Defendants confused the
distinction between an expert's qualifications and the reliability of the proffered
opinion.

As discussed previously, "qualifications and reliability prongs
of *Daubert* are conceptually distinct inquiries" that cannot be collapsed into each
other. *Moore*, 995 F.3d at 853. In *Moore*, a district court erroneously found that a
medical doctor was not qualified to testify because he had not used "the Intuitive
robotic tools at issue and because he could not describe the differences between
those tools and the traditional laparoscopic instruments." *Id*. The Eleventh Circuit,
however, reversed the district court since the doctor's familiarity with the product
at issue goes to the reliability of the opinion, not the expert's qualification. *Id.* at

858. Indeed, the medical doctor was "qualified to perform a differential etiology on a patient who suffered a thermal injury during a hysterectomy performed with a *da Vinci* robot[,] not because of his familiarity with the robot, but because of his familiarity with differential etiologies in the context of gynecological procedures." *Id.* at 853.

Here, as in *Moore*, Dr. Golan is qualified as an expert to perform a differential etiology on Ms. Robinson's infection, not because of his familiarity with the Bair Hugger and airflow disruption in an OR, but because of his familiarity with the (infectious disease) analysis he was tasked with performing. While Defendants are correct that Dr. Golan has repeatedly testified he is not qualified to opine on OR airflow disruptions, *see e.g.*, Dkt. 80-3 at 232:3-6 (testifying he is "definitely not an expert" in airflow, "but I understand the air flow in the operating room to some extent"), this concession does not mean Dr. Golan should be excluded from performing the "task at hand"—i.e., performing a differential etiology on a patient who suffered a *S. aureus* infection following a ORIF surgery. *See Daubert*, 509 U.S. at 597.

To complete this task within his expertise, Dr. Golan relied upon Ms. Robinson's medical records, medical literature, and the reasonable opinions of other experts who are qualified to opine about airflow disruption (i.e., Dr. Elghobashi) to determine that bacteria displaced by the Bair Hugger is a potential

cause of Plaintiff's infection. *See* Dkt. 74-1 at 6, 7 ("Peer-reviewed publications

confirm that Bair Hugger generates an uplifting of air carrying particles that are

contaminated with microbes that are virulent and capable of causing hardware

infection" and referencing Dr. Elghobashi's published report in X. He et al., *Effect

of Heated-Air Blanket on the Dispersion of Squames in an Operating Room*, 34

Int'l J. Numerical Methods Biomedical Eng'g, May 2018 at 1); *see also* Dkt. 80-3

at 130:22-133:15 (discussing Dr. Jarvis's report and the references used to

determine whether the Bair Hugger could be a plausible cause of Plaintiff's

infection). As discussed above in the general causation section of this Order, the

Court has already found Dr. Elghobashi's report to be admissible, and Dr. Golan

could rely on other empirical sources when "ruling in" the Bair Hugger as a

potential source of infection. Defendants' argument about Dr. Golan's lack of

knowledge and expertise on OR airflow, including the Bair Hugger's impact on

OR airflow, is a credibility dispute that should be decided "within the crucible of

cross-examination," not by this Court at the *Daubert* stage. *Moore*, 995 F.3d at

857; *see also Quiet Tech.*, 326 F.3d at 1342 (noting that shortcomings regarding

knowledge of the specific product at issue do not bear on an expert's

qualifications).

Defendants, however, argue that even if Dr. Golan is qualified, his airflow

disruption opinions are "based on unreliable methods and insufficient facts and

26

data." Dkt. 74 at 10. Specifically, Defendants fault Dr. Golan for failing to take "meticulous care to track and account for [the OR design, layout, and sources of air turbulence] in Robinson's May 2021 surgery[,]" not being an orthopedic surgeon, and having "little understanding of the different devices that are used in any given orthopedic procedure, let alone what happens in an OR during such procedures." Dkt. 74 at 12. But such an argument sets an evidentiary burden that is much "too high." *Moore*, 995 F.3d at 854. Rule 702 does not require Dr. Golan to be a surgeon who has used the Bair Hugger in ORIF surgeries in order to provide a differential etiology of Ms. Robinson's infection. Indeed, the Eleventh Circuit has already rejected Defendants' way of reasoning since it would seemingly "bar all expert medical testimony unless the expert has somehow recreated the same conditions that the [patient] was under[,] . . . [and] Rule 702 does not impose such a requirement." *Adams*, 760 F.3d at 1335–36; *see also Moore*, 995 F.3d at 854 ("Our caselaw does not support a bright line rule that an expert witness is qualified to testify regarding the cause of an injury only if he personally has used the allegedly defective product.").

Additionally, the list of airflow disruption sources that Dr. Golan failed to consider in his report—Brandon Hospital's OR and HVAC schematics, Brandon Hospital's protocols on sterility or infection control, the deposition transcripts of Dr. Shah and Dr. Kim, the drape and fluoroscopy (x-ray machine) used in Ms.

Robinson's surgery, and 3M's expert reports (Dkt. 74 at 13)—"are of a character that impugn the accuracy of [Dr. Golan's] results, not the general scientific validity of [differential etiology]." *Quiet Tech*, 326 F.3d 1345. Defendants' "identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination." *Id.* Dr. Golan's alleged failure to consider these other variables of airflow disruption during surgery is an argument that goes to the weight, not the admissibility, of the evidence offered. *Id.* at 1345–46 ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility." (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)) (citation modified)).

Next, Defendants challenge the reliability of Dr. Golan's differential diagnosis itself, as it allegedly "fails to apply reliable principles and methods to 'rule in' the Bair Hugger system as the source of Robinson's *S. aureus* infection[,] [and] he fails to 'rule out' endogenous sources of *S. aureus* as the cause of her infection." Dkt. 74 at 15. The Court disagrees.

"If properly followed, differential diagnosis can be a reliable methodology under *Daubert*." *Arevalo v. Mentor Worldwide LLC*, No. 21-11768, 2022 WL 16753646, at *4 (11th Cir. Nov. 8, 2022) (citing *Chapman*, 766 F.3d at 1309). Differential diagnosis methodology is "a medical process of elimination whereby the possible causes of a condition are considered and ruled out one-by-one, leaving only one cause remaining." *Chapman*, 766 F.3d at 1308 (quotation marks and

citation omitted). The methodology requires three steps: "(1) the patient's condition is diagnosed, (2) all potential causes of the ailment are considered, and (3) differential etiology is determined by systematically eliminating the possible causes." *Id.* (citation omitted). To be reliable, the expert's differential diagnosis "need not rule out all possible alternative causes" but "must at least consider other factors that could have been the sole cause of the plaintiff's injury." *Id.* at 1308–09 (quotation marks and citation omitted). Indeed, "an expert does not establish the reliability of his techniques or the validity of his conclusions simply by claiming that he performed a differential diagnosis on a patient." *McClain*, 401 F.3d at 1253. "[A] differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation." *Guinn*, 602 F.3d at 1253 (quotation marks and citation omitted).

As an initial matter, Defendants' arguments about Dr. Golan failing to reliably "rule in" the Bair Hugger as a potential source of infection are a rehashing of Defendants' general causation motion. *See* Dkt. 73 at 8; Dkt. 74 at 15; *see Thelen*, 2023 WL 3947945, at *3 ("General causation addresses how the possible causes are 'ruled in' in the first place, and cannot be established by differential diagnosis."). The Court has already previously discussed at length why Dr. Elghobashi and Dr. Golan's general causation opinions properly "ruled in" the Bair Hugger as a potential source of surgical site infection.

Turning to Defendants' argument on whether Dr. Golan properly "ruled out"
endogenous sources of *S. aureus* as the cause of Ms. Robinson's infection, the
Court finds Dr. Golan has shown he "at least consider[ed] other factors that could
have been the sole cause of the plaintiff's injury." *Chapman*, 766 F.3d at 1309. Dr.
Golan does not merely declare his specific causation opinion *ipse dixit* without
citing other relevant medical information that establishes a causal connection
between the Bair Hugger device and Plaintiff's infection during ORIF surgery. *See
generally* Dkt. 80-1. Defendants, however, articulate three "obvious" alternative
sources of Ms. Robinson's *S. aureus* infection that Dr. Golan allegedly failed to
consider: the presence of *S. aureus* on Ms. Robinson's skin during surgery, a post-
surgery infection, and a breach of infection control measures during surgery. Dkt.
74 at 17–20. The Court disagrees. A review of Dr. Golan's report and deposition
demonstrates that he adequately considered these alternative sources before ruling
them out.

First, a review of Dr. Golan's expert report demonstrates that he
acknowledged Ms. Robinson's skin flora (during surgery) as a possible source of
infection and then properly ruled it out:

> Because S. aureus, CNS, Corynebacterium and Propionibacterium are
> commonly found on humans' skin, they are common pathogens in
> hardware infections. Each of these and other infecting pathogens can
> arise from an endogenous or exogenous source. Endogenous sources
> include the patients' own flora- from their skin, mucous membranes,
> gastrointestinal tract, or seeding from a distant focus of infection via a

bloodstream infection. In the case of hardware infection development, endogenous causes are implicated when the surgical site never heals and becomes infected immediately after surgery, usually due to problems with wound healing or the development of a bloodstream infection with secondary seeding of the hardware. . . .

In support of the development of a bone hardware infection that is the result of contamination of the surgical field during surgery and to decipher whether any intra-surgery factor may be responsible for such contamination, the following questions need to be considered: . . . b) Was the hardware infection acquired during surgery or after surgery? . . .

Ms. Robinson underwent her first right knee surgery on 5/6/21. Prior to the surgery, there were no local or systemic signs of infection and there were no violations to the skin's integrity. During the surgery, the tissues appeared non-inflamed with no signs of infection, supporting a decision to proceed and place a plate and screws to repair the fracture. . . .

b) Was Ms. Robinson's hardware infection acquired before the 5/6/21 surgery, during the 5/6/21 surgery or was it acquired after that surgery? At the time of her 5/6/21 surgery, there were no signs of infection and none of her care providers suspected an infection. Intra-operative findings on 5/6/21 were inconsistent with an existing infection at that time. It is therefore unlikely that Ms. Robinson was already infected on 5/6/21. After the 5/6/21 surgery, up to a few days before Ms. Robinson's 6/16/21 follow up visit, Ms. Robinson's surgical wound was healing well with no documentation of wound dehiscence or drainage. . . . Therefore, it is highly likely that Ms. Robinson's infection was acquired during the 5/6/21 surgery.

Dkt. 80-1 at 4–6; *see also* Dkt. 80-3 at 186:9-192:3 (Dr. Golan discussing endogenous flora and concluding Ms. Robinson's endogenous flora "is a very unlikely cause" of her infection). Defendant, however, contends that Dr. Golan could only rule out an "endogenous/direct-contact source" by quantifying that risk

and weighing it against the risk from airborne sources. Dkt. 74 at 17. Dr. Golan's failure to conduct a "quantitative assessment" of the Bair Hugger's risk compared to other risks in the OR does not mean his differential etiology is unreliable; instead, it means Dr. Golan's opinion has inadequacies that should be brought up during cross-examination. *See Quiet Tech*, 326 F.3d at 1345–46. Based on the record, the Court cannot conclude that the elimination of Ms. Robinson's flora as a potential cause of her infection was based on "subjective beliefs or unsupported speculation." *Chapman*, 766 F.3d at 1310 (quoting *Hendrix*, 609 F.3d at 1197).

Second, Dr. Golan sufficiently ruled out post-surgery inoculation from Ms. Robinson's skin as a source of her infection. Defendants point out that Dr. Golan admitted that Ms. Robinson's post-surgery wound dehiscence could have provided a pathway for deep infection, *see* Dkt. 74 at 19, but Dr. Golan's admission is taken out of context. In Dr. Golan's report, he fully considers Ms. Robinson's wound dehiscence and ruled it out as a possible cause of infection, explaining:

> After the 5/6/21 surgery, up to a few days before Ms. Robinson's 6/16/21 follow up visit, Ms. Robinson's surgical wound was healing well with no documentation of wound dehiscence or drainage. During this critical period of time post-surgery, there was no potential portal of entry of bacterial pathogens into the wound. A few days later, on 7/1/21, when Ms. Robinson underwent surgery to explore the deep tissues, bone, and hardware, there was clear evidence of deep infection affecting the hardware and the bone. The development of clinical signs of bone involvement, such that can be identified by a surgeon during surgery, requires a minimal period of 3-4 weeks to develop. In Ms. Robinson's case, the first signs of wound dehiscence were observed approximately two weeks prior to the 7/1/21 surgery

32

and not earlier. This leading time of 2 weeks would be insufficiently short to allow the development of clinical signs of infection in the bone and hardware. In addition, other intra-operative findings such as the existence of extensive fibrinous tissue is consistent with an established infection that would have taken longer than 2 weeks to develop. Furthermore, even when wound dehiscence was observed, Ms. Robinson's care providers did not express any concern regarding a deep wound, such that can lead to the bone and hardware, or the existence of a deep tissue infection. While the wound dehiscence could have served as a contributing factor to the earlier diagnosis of hardware and bone infection, in my opinion, for the reasons mentioned above, it is unlikely that the wound dehiscence caused the infection of hardware and bone. Therefore, it is highly likely that Ms. Robinson's infection was acquired during the 5/6/21 surgery.

Dkt. 80-1 at 5–6. On the topic of post-surgery infection, Dr. Golan's deposition

further articulated that:

Q. [D]id you rule in any of Ms. Robinson's comorbid conditions as potential risk factors for her to develop an infection as part of your differential diagnosis?

A. I looked at all her information. I considered any of her risk factors as factors that may increase her risk of infection in general. And in my differential diagnosis, I focused on the translocation of bacteria into the sterile site and whether it happened before, during and after surgery, because this is the question in hand.

Q. Did you rule out the possibility that the bacteria that caused Ms. Robinson's infection got into the joint after her surgery?

A. To a -- an extent of high likelihood, I did.

Q. And how did you do that?

A. I looked at her wound healing, particularly her immediate wound healing, as reflected in the medical chart, to make sure that there were no issues with the wound healing, particularly not over the first week or two, that there were no dehiscence during this period of time; that

there were no -- no drainage during this period of time. During this period of time, it takes time for the deeper tissues to seal from the outside world. And during this period of time, if the wound wouldn't heal, bacteria could have penetrated the wound from the outside. I also looked at the way she developed her infection. I also looked at the operative report and what they actually observed during surgery in terms of the infected tissues and where was most of the infection. It was deeply within the deep tissues. And when I looked at all of this information and the totality of data, it appeared like the likelihood that she developed the infection after surgery is very low.

Dkt. 80-3 at 211:23-213:13.

But Dr. Golan's differential diagnosis did not stop there. Contrary to Defendants' assertion that Dr. Golan "ignore[d] Robinson's multiple risk factors for delayed wound healing" that could have "extended the opportunity for wound inoculation" post-surgery, *see* Dkt. 74 at 19, Dr. Golan's deposition shows he considered Ms. Robinson's post-surgery "noncompliance with physician orders," including her "weight bearing [as] a risk factor for wound non-healing," but dismissed it as a cause of her infection "because her weight bearing did not lead to wound-healing issues, particularly not during the first two or three weeks after surgery, [so Dr. Golan] didn't consider the wound non-healing to be an important or likely factor contributing to infection in her case." Dkt. 80-3 at 214:20-218:10 (showing Dr. Golan being questioned on Ms. Robinson's weight bearing as a risk factor for infection and concluding "for weight bearing to serve as a risk factor for infection is through wound dehiscence and wound non-healing [which] happens early. And this hasn't happened in this case"); *see also id.* at 203:13-211:2 (Dr.

Golan also considering Ms. Robinson's smoking and malnutrition as risk factors for infection). Again, Dr. Golan properly ruled out a post-surgery infection based on relevant medical information and his expertise as an infectious disease expert.

Third, Dr. Golan addressed a possible breach of infection control measures during surgery and explained why it was excluded as a potential source of infection. As described in his expert report, Dr. Golan opined that:

> During the 5/6/21 surgery, [were] there any factors that are known to increase the risk of intra-surgery contamination? A careful review of all medical records revealed no evidence of a breach of any of the infection control measures which are practiced in the operating room during surgery to prevent hardware infections. Specifically, there was no prolonged pre-surgery hospital stay, the surgery was not complicated, there were no documented problems with the sterility of instruments or solutions which were used during surgery, and there was no documented breach of sterile technique by the surgeons and those present at surgery.

Dkt. 80-1 at 6.[9] In the absence of any evidence of a breach of sterile treatment of instruments and hardware, there is sufficient evidence to support Dr. Golan's opinion that the hardware was the likely source of the *S. aureus* infection after being contaminated by bacteria blown by the Bair Hugger. Defendants' argument that "infection prevention measures" at the hospital only "reduce the risk of infection, [but] they do not eliminate it" is an issue that can be raised at trial, not at the *Daubert* stage. Dkt. 74 at 19.

---

[9] Additionally, Dr. Kim and Dr. Shah both testified that neither doctor recalled a breach of sterility protocol, and if there were a breach during Ms. Robinson's surgery, they would have documented it in a report. *See* Dkt. 83-34 at 95:3-12; Dkt. 83-38 at 149:5-19.

In sum, Dr. Golan's differential diagnosis sufficiently enumerates a comprehensive list of alternative causes and then systematically eliminates those potential causes. *See Guinn*, 602 F.3d at 1254. The Court finds Dr. Golan offered a sufficient explanation as to why his specific causation opinion—that Ms. Robinson's infection was acquired during her ORIF surgery, and that the Bair Hugger was the most likely cause of this infection—is reliable under Rule 702.

## II.    Defendants' Motion for Summary Judgment

In addition to the motions to exclude, Defendants bring a motion for summary judgment on all of Plaintiff's claims. Defendants argue that "[a]part from causation, many of Robinson's claims (including gross negligence, failure-to-warn, implied warranty, violation of [FDUTPA], misleading advertising, unjust enrichment, and punitive damages) fail for additional reasons." Dkt. 76 at 2. Plaintiff responds, contending she has "proffered sufficient evidence to create a genuine issue of material fact in favor of negligence (Count I), gross negligence (Count II), failure to warn (Count III), defective design (Count IV) and misleading advertising (Count VII), as well as her prayer for punitive damages." Dkt. 81 at 4.[10]

---

[10] As for the other counts not listed, Plaintiff states that "Ms. Robinson does not intend to pursue her claims for unjust enrichment, violation of FDUTPA, and breach of implied warranty at trial and therefore does not respond to Defendants' arguments on these claims." Dkt. 81 at 4 n.2. As such, the Court grants Defendants' motion for summary judgment as to Counts V, VI, and VIII.

a. *Legal Standard*

Summary judgment is only appropriate when there is "no genuine issue as to any material fact [such] that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed R. Civ. P. 56(a). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001) (noting a court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party"). Once the moving party satisfies its initial burden, it shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); *Celotex*, 477 U.S. at 324; Fed. R. Civ.

P. 56(e), (c). Speculation or conjecture cannot create a genuine issue of material

fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

The court may not weigh evidence to resolve a factual dispute; if a genuine

issue of material fact is present, the court must deny summary

judgment. *Hutcherson v. Progressive Corp.,* 984 F.2d 1152, 1155 (11th Cir. 1993).

Likewise, the court should deny summary judgment if reasonable minds could

differ on the inferences arising from undisputed facts. *Miranda v. B & B Cash

Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992).

Importantly, a district court is only required to consider "the cited materials"

when deciding a summary judgment motion, Fed. R. Civ. P. 56(c)(3), and

"[m]aking district courts dig through volumes of documents and transcripts would

shift the burden of sifting from petitioners to the courts . . . [D]istrict court judges

are not required to ferret out delectable facts buried in a massive record." *Chavez v.

Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011). "[T]here is no

burden upon the district court to distill every potential argument that could be

made based on the materials before it on summary judgment. Rather, the onus is

upon the parties to formulate arguments; grounds alleged in the complaint but not

relied upon in summary judgment are deemed abandoned." *Solutia, Inc. v.

McWane, Inc.*, 672 F.3d 1230, 1239 (11th Cir. 2012) (per curiam) (citing *Resol. Tr.

Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc)).

### b. Discussion

Defendants moves for summary judgment on several grounds, arguing all of Ms. Robinson's claims fail because she lacks admissible evidence of causation (Counts I–VIII); Florida does not recognize a stand-alone cause of action for gross negligence (Count II); Ms. Robinson's failure-to-warn claim fails for lack of a duty to warn and lack of causation (Count III); Ms. Robinson's misleading advertising claim fails because Fla. Stat. § 817.41 does not apply to personal injury cases in the absence of a direct transaction between the parties (Count VII); and Plaintiff's prayer for punitive damages fails. Dkt. 76 at 9, 11, 16, 21. The Court will address each argument in turn.

### i. General and Specific Causation

To prove causation under Florida law, which applies to Ms. Robinson's tort claims,[11] the plaintiff must introduce evidence that "it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result." *Guinn*, 602 F.3d at 1256 (quoting *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984)). To avoid summary judgment in this products liability case, Ms. Robinson must have "*Daubert*-qualified, general and specific-causation-

---

[11] In diversity cases, federal courts apply the substantive law of the state in which the case arose—here, Florida law. *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1132–33 (11th Cir. 2010).

expert testimony that would be admissible at trial." *Chapman*, 766 F.3d at 1316; *see also Shepard v. Barnard*, 949 So. 2d 232, 233 (Fla. 5th DCA 2007) (approving trial court's grant of summary judgment against plaintiff after excluding plaintiff's medical experts' testimony, because the doctors were needed "to provide opinions regarding any causal link between the alleged injury and the medical treatment").

Here, for the reasons discussed above, and in light of the Court's decision to deny Defendants' motions to exclude Plaintiff's general and specific causation experts, the Court finds there is sufficient evidence of the required element of causation for a reasonable juror to find in Plaintiff's favor on her tort claims. As such, the Court rejects Defendants' causation arguments as to all counts.

### ii. Gross Negligence (Count II)

Defendants argue that Florida law does not allow for a "stand-alone" cause of action for gross negligence. Dkt. 76 at 11. Plaintiff appears to concede that her stand-alone gross negligence claim may not be a permitted cause of action under Florida law, but still asserts that Florida jurisprudence acknowledges it as a distinct claim. Dkt. 81 at 10 n.5 ("Plaintiff acknowledges that some courts, primarily in the Northern District of Florida, have held that gross negligence is not a stand-alone claim.").

Interestingly, Plaintiff fails to cite a single Florida Supreme Court or Florida District Court of Appeal case that demonstrates gross negligence can be pled as a

standalone count. Conversely, there is ample case law indicating that gross negligence is not a standalone count, but rather a legal standard that must be met when seeking punitive damages under Fla. Stat. § 768.72(2). *See Geery v. Ethicon, Inc.*, No. 6:20-CV-1975-RBD-LRH, 2021 WL 2580167, at *3 (M.D. Fla. Apr. 20, 2021) (granting summary judgment to the Defendant on a gross negligence claim in light of the parties' agreement that gross negligence "is not a standalone cause of action under Florida law" and noting that "[t]his does not preclude Plaintiff from seeking punitive damages in her surviving claims under the gross negligence standard"); *Hughes-Payne v. Argon Med. Devices, Inc.*, No. 3:22-CV-1944-TKW-ZCB, 2022 WL 19408078, at *2 (N.D. Fla. July 29, 2022) ("[The plaintiff] should also consider whether it is necessary or proper to plead 'gross negligence' as a separate stand-alone count."); *Smith v. Ethicon, Inc.*, No. 4:20-CV-394-MW/MAF, 2020 WL 9071685, at *3 (N.D. Fla. Dec. 28, 2020) ("[G]ross negligence is a heightened standard of proof to receive punitive damages under Florida law and not a stand-alone claim."); *Duff v. Racine*, --- So.3d ----, 2025 WL 1646730, at *2, 4 (Fla. 4th DCA June 11, 2025) (reversing trial court order granting the plaintiff's motion for leave to assert a punitive damages claim since the trial court failed to determine if there was sufficient showing of gross negligence); *Cleveland Clinic Fla. Health Sys. Nonprofit Corp. v. Oriolo*, 357 So. 3d 703, 706 (Fla. 4th DCA 2023) (noting a claim for punitive damages can only be

brought when the proffered evidence meets a gross negligence standard under Fla.
Stat. § 768.72(2)); *Brady v. SCI Funeral Servs. of Fla., Inc.*, 948 So. 2d 976, 978–
79 (Fla. 1st DCA 2007) (declining to require the plaintiffs to plead a gross
negligence count separate from their ordinary negligence count).

As such, the Court enters summary judgment for Defendants on Count II.
However, this does not preclude Plaintiff from seeking punitive damages in her
surviving claims under the gross negligence standard of Fla. Stat. § 768.72(2)(b).

### iii.  Failure-to-Warn (Count III)

Defendants contend that Plaintiff's failure-to-warn claim fails since Ms.
Robinson "cannot establish that 3M owed a duty to warn of an increased risk of
surgical site infections with the Bair Hugger system; and [] because Robinson has
no evidence that any purported failure to warn by 3M caused her injuries." Dkt. 76
at 16.

To succeed on a failure-to-warn claim, the "plaintiff must show (1) that the
product warning was inadequate; (2) that the inadequacy proximately caused her
injury; and (3) that she in fact suffered an injury from using the product." *Salinero
v. Johnson & Johnson*, 995 F.3d 959, 964 (11th Cir. 2021) (first citing *Eghnayem
v. Bos. Sci. Corp.*, 873 F.3d 1304, 1321 (11th Cir. 2017), then citing *Hoffmann-La
Roche Inc. v. Mason*, 27 So. 3d 75, 77 (Fla. 1st DCA 2009)).

However, in cases involving medical products like the Bair Hugger, "the duty of a device manufacturer to warn of dangers involved in the use of a device is satisfied if it gives adequate warning to the physician who prescribes the device." *Salinero*, 995 F.3d at 965 (citing *Buckner v. Allergan Pharms., Inc.*, 400 So. 2d 820, 823 (Fla. 5th DCA 1981) (alterations accepted)); *see also Eghnayem*, 873 F.3d at 1321. "The physician acts as a 'learned intermediary' between the manufacturer and the patient, 'weighing the potential benefits of a device against the dangers in deciding whether to recommend it to meet the patient's needs.'" *Salinero*, 995 F.3d at 965 (quoting *Eghnayem*, 873 F.3d at 1321). As such, to meet the causation element in a medical device failure-to-warn claim, "a plaintiff must show that her treating physician would not have used the product had adequate warnings been provided." *Id.* Moreover, "[t]he causal chain may still be broken even if the manufacturer provides an inadequate warning so long as the physician is aware of the risks or would still recommend the device despite those risks." *Id.*

Here, Defendants argue they had no duty to warn because there were no risks known to them from the scientific and medical data available at the time of Plaintiff's surgery. Dkt. 76 at 12. To support this argument, Defendants point to a 2017 "Safety Alert" from the FDA that reminded "health care providers that using thermoregulation devices during surgery, including forced air thermoregulating systems, ha[s] been demonstrated to result in less bleeding, faster recovery times,

and decreased risk of infection for patients." Dkt. 83-37 at 1 (showing FDA Safety Alert); *see* Dkt. 76 at 12.

However, Plaintiff points to various types of rebuttal evidence in support of her argument that 3M knew (or should have known) of the risk of infections from the use of the Bair Hugger. First, as discussed above, some of the scientific studies Plaintiff's experts relied on in reaching their general causation opinions were published before Plaintiff's 2021 ORIF surgery and identified an association between the use of the Bair Hugger and an increased risk of airborne contamination. *See e.g.*, Dkt. 73-5 at 1537 (showing the McGovern 2011 study). Second, Plaintiff has provided a sworn filing submitted to the FDA in January 1996 where 3M admitted that "[a]irborne contamination from air blown intra-operatively across the surgical wound may result in airborne contamination." S-Dkt. 82-1 at 3. Third, Defendants' own Clinical Research Director acknowledged in 2010 that "[a]ctually, there is evidence that [forced-air warming] increases risk" of surgical site infections. S-Dkt. 82-4 at 2. Lastly, Plaintiff has provided evidence that Defendants included warning labels on the original Bair Hugger model, which warned of the possibility of airborne contamination and against the use of the machine in an OR. Dkt. 104-29 at 3–5. Construing the facts in the light most favorable to Plaintiff, the Court finds a reasonable jury could conclude Defendants had knowledge of the risk of surgical site infection from use of the Bair Hugger.

Nevertheless, Defendant argues that even if Plaintiff is correct about an inadequate warning, Dr. Kim's testimony severs the causal chain since he stated that he would not have changed his decision to use the Bair Hugger system during Ms. Robinson's May 2021 surgery and would even use the Bair Hugger again if he had to redo Ms. Robinson's surgery. Dkt. 76 at 15; *see* Dkt. 83-34 at 82:18-84:21, 119:24-120:5. The Court disagrees. Setting aside the fact that Dr. Shah indicated he had ultimate decision-making authority as the surgeon, Dkt. 83-38 at 152:24-153:3, it is undisputed that Dr. Kim (and the anesthesiology department) never received any warning from 3M regarding the Bair Hugger. Dkt. 83-34 at 96:10-13 ("But at this point, there was -- there has been no warnings about using the Bair Hugger as a warming device to prevent infection, so that's not one of the guidelines that's been proposed by our department."); *id.* at 98:16-19 ("When was the last time that you looked at the instructions to see if there were any warnings or contraindications related to the use of the Bair Hugger? Well, I can't say I remember any of those times."). Indeed, the deposition questions directed at Dr. Kim primarily focused on what he would do if 3M provided a *hypothetical warning* to him about the risks associated with the Bair Hugger. *See e.g.*, *id.* at 95:25-96:4, 98:20-22. As such, the Court cannot even apply the learned intermediary doctrine to determine if the warning was adequate because there was no warning to the physicians in this case.

45

Nor is this a case where, even if 3M provided an inadequate warning, the causal chain is still broken because the physician was *actually aware* of the risks or would continue using the Bair Hugger despite those risks. *See Small v. Amgen, Inc.*, 723 F. App'x 722, 725 (11th Cir. 2018) (explaining that the learned intermediary doctrine applies, "regardless of the sufficiency of the warning, where a learned intermediary has *actual knowledge* of the substance of the alleged warning and would have taken the same course of action even with the information the plaintiff contends should have been provided" to the physician (emphasis added) (citation and quotations omitted)). Dr. Kim's testimony forecloses any argument that he had actual knowledge of any alleged risks with the Bair Hugger, *see* Dkt. 83-34 at 72:6-75:7 (Dr. Kim testifying he is unaware of the alleged risks with the Bair Hugger and surgical site infections), and affirms he would no longer use the Bair Hugger if warned by 3M about alleged risks. *Id.* at 99:1-5 ("If 3M had warned you that the Bair Hugger was contraindicated in orthopedic procedures, you would no longer use it for orthopedic procedures. Would you agree with that? Yes, correct. Yes."); *see also id.* at 95:25-96:14, 100:16-25. Dr. Shah also testified that he was not aware of the risks associated with the Bair Hugger and would have stopped using it in orthopedic surgeries if he had been warned by 3M. *See* Dkt. 83-38 at 155:7-156:18. Thus, the Court finds Plaintiff has demonstrated a genuine

dispute of material fact over her failure-to-warn claim. Defendants' motion for summary judgment as to Count III is denied.

### iv.  Misleading Advertising Claim (Count VII)

Florida law prohibits any person from making or disseminating before the general public of the State any misleading advertisement. *See* Fla. Stat. § 817.41(1). A "misleading advertisement" is defined by statute as:

> [A]ny statements made, or disseminated, in oral, written, electronic, or printed form or otherwise, to or before the public, or any portion thereof, which are known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading, and which are or were so made or disseminated with the intent or purpose, either directly or indirectly, of selling or disposing of real or personal property, services of any nature whatever, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services.

Fla. Stat. § 817.40(5). To prove a misleading advertising claim, a plaintiff must show that: "(1) the representor made a misrepresentation of a material fact; (2) the representor knew or should have known of the falsity of the statement; (3) the representor intended that the representation would induce another to rely and act on it; and (4) the plaintiff suffered injury in justifiable reliance on the representation." *Akai Custom Guns, LLC v. KKM Precision, Inc.*, 707 F. Supp. 3d 1273, 1286 (S.D. Fla. 2023) (citing *Vance v. Indian Hammock Hunt & Riding Club*, 403 So. 2d 1367, 1370-72 (Fla. 4th DCA 1981)).

Additionally, when the plaintiff is a consumer, there must be "direct reliance" on the misrepresentation. *See Westgate Resorts, Ltd. v. Reed Hein & Associates, LLC*, No. 6:18-CV-1088-ORL-31DCI, 2018 WL 5279156, at *8 (M.D. Fla. Oct. 24, 2018); *Serv. Experts LLC v. Am. Serv. Experts, LLC*, No. 5:23-CV-199-GAP-PRL, 2023 WL 11257417, at *3 (M.D. Fla. Oct. 30, 2023) (citing *Third Party Verification, Inc. v. Signaturelink, Inc.*, 492 F. Supp. 2d 1314, 1322 (M.D. Fla. 2007)); *see also Joseph v. Liberty Nat'l Bank*, 873 So. 2d 384, 388 (Fla. 5th DCA 2004) ("[T]he adoption of section 817.41(1) requires one seeking to maintain a civil action for violation of the statute to prove each of the elements of common law fraud in the inducement, including reliance and detriment, in order to recover damages.").

Here, the parties dispute whether Section 817.41 even applies to personal injury claims. *See* Dkt. 76 at 16; Dkt. 81 at 16. To resolve this motion for summary judgment, the Court assumes (without holding) that Plaintiff can bring a misleading advertising claim and that she engaged in a "commercial transaction" with 3M. *See Brown v. Oceania Cruises, Inc.*, No. 17-22645-CIV, 2017 WL 10379580, at *7 (S.D. Fla. Nov. 20, 2017) (rejecting the defendant's argument that a misleading advertising claim under Section 817.14 cannot be brought in personal injury cases since the plaintiff's purchase of the defendant's cruise ticket was a "commercial transaction"). Nevertheless, the Court grants summary judgment in

48

Defendants' favor on Count VII since Plaintiff has not proven that 3M made any misrepresentations or false statements in connection with an advertisement that was intended to induce Ms. Robinson's reliance and ultimate use of the Bair Hugger in her ORIF surgery.

First, the record is unclear about which material statements are at issue. The Amended Complaint alleges that "[t]he information distributed by Defendants to the public, the medical community, and Plaintiff's healthcare providers, including reports, press releases, advertising campaigns, labeling materials, print advertisements, and commercial media containing material representations was false and misleading, and contained omissions and concealed facts about the dangers of the use of the Bair Hugger device." Dkt. 53 ¶ 156. But Plaintiff's response to the motion for summary judgment fails to point to any reports, press releases, advertising campaigns, labeling materials, print advertisements, and commercial media in the record that support this allegation. Instead, the only thing Plaintiff cites is a single sealed exhibit to prove 3M misrepresented material facts, *see* Dkt. 81 at 19 (citing Plaintiff's exhibit 33), but Plaintiff's exhibit 33 is a confidential clinical trial protocol from 2007 by Defendant Arizant. *See* S-Dkt. 82-2. The Court is unsure whether this (sealed) clinical trial protocol was even disseminated to the general public, much less a study that Ms. Robinson (or her treating physicians) relied on to use the Bair Hugger in her May 2021 surgery.

Second, even assuming the 2007 clinical trial protocol is an adequate misrepresentation, Plaintiff has not shown she was injured acting in justifiable reliance on that misrepresentation. There is no dispute that Ms. Robinson was not involved in the decision to use the Bair Hugger during her May 2021 surgery and was not aware that a Bair Hugger had been used until months later. Dkt. 75 ¶ 27; Dkt. 83 ¶ 27. No reasonable jury could find that Ms. Robinson directly relied on any misrepresentation to use the Bair Hugger in her surgery. Plaintiff's confusing citations to Dr. Golan's expert report and deposition (without any page citations) to prove Ms. Robinson's reliance do not create a genuine dispute of material fact. *See* Dkt. 81 at 19 (citing Plaintiff's exhibits 34 and 37). As for Ms. Robinson's physicians (Dr. Kim and Dr. Shah), Plaintiff has pointed to no evidence in the record that either of them relied on any misrepresentation from 3M in using the Bair Hugger in the May 2021 surgery. Indeed, Plaintiff cannot show any reliance since her failure-to-warn claim is premised on the allegation that no statements/warnings from 3M (about the Bair Hugger's risks) were ever made to Dr. Shah or Dr. Kim.

Third, to the extent Plaintiff is bringing her theory of liability for misleading advertising on a misrepresentation by omission (either to Ms. Robinson or her physicians), Section 817.41 forecloses this argument. The statute explicitly references "any statement" in defining and proscribing misleading advertising, but

50

there is no reference to a misrepresentation or false advertisement by omission.
*Compare* Fla. Stat. § 817.40(5) ("The phrase 'misleading advertising' includes any statements made, or disseminated, in oral, written, electronic, or printed form . . ."), *with* Fla Stat. § 634.436(1) (defining false advertising of insurance policies as "[k]nowingly making, issuing, circulating, or causing to be made, issued, or circulated, any estimate, illustration, circular, statement, sales presentation, [or] omission . . ."). As another district court has already recognized:

> [i]f the Florida Legislature had intended that liability for false advertising under section 817.41 encompass misrepresentations by omission, it could have so stated, as it has done in the context of false advertising in the insurance industry. But it did not, and Plaintiffs have not cited any case law for the proposition that false advertising encompasses misrepresentations by omission under the applicable Florida statute. Thus, any omission on SCI's website relating to KKM barrels does not rise to the level of a misrepresentation of a material fact for purposes of a misleading advertising claim.

*Akai Custom Guns*, 707 F. Supp. 3d at 1287–88. Because any alleged representation by 3M did not induce Plaintiff's reliance and use of the Bair Hugger in her surgery, the Court grants summary judgment for Defendants on Count VII.

v.  Punitive Damages

Finally, Defendants argue that Plaintiff has not shown that "3M acted with evil motive or engaged in intentional, willful, wanton, or reckless conduct in manufacturing the Bair Hugger system." Dkt. 76 at 22. Plaintiff responds by summarily stating, "[b]ecause Plaintiff proffered sufficient evidence to survive

summary judgment on gross negligence, Plaintiff survives summary judgment on punitive damages." Dkt. 81 at 20.

"A defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence." Fla. Stat. § 768.72(2). "Gross negligence" occurs when the defendant's conduct is "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." *Id.* § 768.72(2)(b). To be "clear and convincing," evidence "must be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established." *Acevedo v. State*, 787 So. 2d 127, 130 (Fla. 3d DCA 2001); *Slomowitz v. Walker*, 429 So. 2d 797, 800 (Fla. 4th DCA 1983). "To avoid summary judgment, Plaintiff must point to evidence that would allow a reasonable jury, applying the clear and convincing standard, to find that punitive damages are appropriate." *Thelen v. Somatics, LLC*, 672 F. Supp. 3d 1216, 1227 (M.D. Fla. 2023) (citing *Anderson,* 477 U.S. at 255–56).

Here, while it is a close call, the Court rejects Defendants' assertion that there is insufficient evidence of punitive damages to survive summary judgment. Plaintiff has at least pointed to some evidence that could allow a reasonable jury to find by clear and convincing evidence that Defendants were grossly negligent.

Indeed, there is testimony from 3M's representative that they had some knowledge about the risk of surgical site infections, internal correspondences and documents from 3M employees that suggest that 3M was aware that some orthopedic surgeons had "amazing concern" about forced-air warmers moving particulates in the air, the removal of warning labels in early Bair Hugger models that warned against using the device in ORs, and all the previously discussed empirical and case studies showing a growing concern of surgical site infection when using forced-air warmers (like the Bair Hugger). *See* Dkt. 104-29; *see also Boncher*, 2025 WL 511116, at *17 (permitting punitive damages claim under Pennsylvania law in Bair Hugger litigation). Taken together, this evidence amounts to more than just mere negligence—it creates a triable issue of fact for the jury as to whether Defendants' conduct is grossly negligent under a clear and convincing standard. Drawing all inferences from this evidence in Plaintiff's favor, a reasonable jury could find Defendant acted with reckless indifference to the safety of patients. Defendants' motion for summary judgment is denied on Plaintiff's prayer for punitive damages.

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that:

1. Defendants' Motion to Exclude Plaintiff's General Causation Experts, Dkt. 73, is **DENIED.**

2. Defendants' Motion to Exclude Specific Causation Opinions of Plaintiff's Expert Dr. Yoav Golan, Dkt. 74, is **DENIED.**

3. Defendants' Motion for Summary Judgment, Dkt. 76, is **GRANTED in part and DENIED in part**.

    a. Summary judgment is **GRANTED** on **Counts II, V, VI, VII, and VIII.**

    b. Summary judgment is **DENIED** on **Counts I, III, and IV.**

    c. Plaintiff Robinson is also permitted to bring her prayer for punitive damages under Fla. Stat. § 768.72. *See* Dkt. 53 at 28.

**DONE AND ORDERED** at Tampa, Florida, on July 23, 2025.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record